**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**FORT CAMPBELL DIVISION**
**Criminal Action No. 5:22-mj-00245-LLK**

UNITED STATES OF AMERICA
      PLAINTIFF,

v.

SAMANTHA R. WICK
      DEFENDANT.

**MEMORANDUM OPINION AND ORDER**

Defendant Samantha Wick is charged by information with violating the Assimilative Crimes Act, 18 U.S.C. § 13 though an underlying alleged violation of Kentucky Revised Statute 530.060 (Endangering the Welfare of a Child). This matter is before the Court on Defendant's Motion to Dismiss the Information. [DN 11]. The matter being fully briefed, it is ripe for ruling. *See* [DN 11, 13, 15]. This prosecution occurs in Fort Campbell, Kentucky, within the special maritime and territorial jurisdiction of the United States. Information [DN 1].

Defendant argues that the 1974 Kentucky Crime Commission/Legislative Research Commission Commentary ("Commentary") to KRS 530.060 mandates that there be a prior finding of neglect[1], dependency[2], or delinquency[3] of a child prior to prosecuting endangering the welfare

---

[1] These terms are not defined within the Kentucky Penal Code. The Court notes they are defined in the Kentucky Unified Juvenile Code, Ky. Rev. Stat. § 600–645. Defined at Ky. Rev. Stat § 600.020(1), "'Abused or neglected child' means a child whose health or welfare is harmed or threatened with harm when" their parent or guardian "inflicts or allows to be inflicted upon the child" physical or emotional injury, among other harms.

[2] Defined at Ky. Rev. Stat. § 600.020(20), "'[d]ependent child' means any child, other than an abused or neglected child, who is under improper care, custody, control, or guardianship that is not due to an intentional act of the parent, guardian, or person exercising custodial control or supervision of the child.

[3] While not explicitly defined in either the Kentucky Penal Code or the Kentucky Unified Juvenile Code, "delinquent child" means a child who has convicted violations other than status offenses. *See, e.g.*, Ky. Rev. Stat. § 635.083 ("A juvenile convicted or adjudged delinquent of

of that child. Mot. Dismiss Information [DN 11] at 2. Because the Government alleges no such finding, Defendant argues the Information must be dismissed. [DN 11] at 3.

This Court is bound by the Kentucky Supreme Court's interpretation of the Commentary. Because the Kentucky Supreme Court applies the Commentary as if it were part of a statute's text, even when the language of the statute is otherwise unambiguous and canons of statutory construction would otherwise caution against applying the Commentary, Defendant's Motion to Dismiss Information is **GRANTED**.

## LEGAL STANDARD

A criminal defendant may move to dismiss an information before trial if the information fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). To prevail, the defendant must show the information fails to allege "conduct satisfying every element of the charged offense." *United States v. Maddux*, 917 F.3d 437, 443 (6th Cir. 2019) (explaining standard for dismissing an indictment); *see also United States v. Mostofsky*, 579 F. Supp. 3d 9, 14–15 (D.D.C. 2021) (applying the indictment standards to an information for motions to dismiss). For a motion to dismiss, "the allegations of the indictment must be taken as true." *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952). A Magistrate Judge's ruling on a motion to dismiss an information is appealable to a District Judge. 18 U.S.C. § 3402. So long as jeopardy has not attached, either the defendant or the Government may appeal. *See* 18 U.S.C. § 3731 (permitting government appeal of a dismissal of an information); 28 U.S.C. § 1291 (permitting appeals of final judgments); *Midland*

---

three or more offenses, other than violations or status offenses[.]"; Ky Rev. Stat. § 610.320 (referring to juvenile delinquency proceedings for minors who have committed misdemeanors or felonies).

2

*Asphalt Corp. v. United States*, 489 U.S. 794 (1989) (requiring conviction before a defendant may appeal pretrial orders).

The Assimilative Crimes Act "provides that in the absence of a governing federal statute, a person who commits a state crime on a federal enclave 'shall be guilty of a like offense and subject to a like punishment.'" 18 U.S.C. § 13(a); *United States v. Jensen*, 278 F. App'x 548, 549 (6th Cir. 2008). The Act incorporates state substantive law, and state court decisions interpreting state statutes assimilated into federal law are binding on federal courts. 18 U.S.C. § 13; *United States v. Price*, 812 F.2d 174, 175 (4th Cir. 1987). Where a state high court has not spoken, the federal court must "apply the principles of statutory construction that it believes would be used by [the state high court] in construing [the statute]." *United States v. Guyette*, 382 F. Supp. 1266, 1268 (E.D. Va. 1974) (referencing *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 203 (1956)). This deference to state substantive law does not extend to state procedure, and cases arising under the Assimilative Crimes Act follow federal procedural law. *See, e.g.*, *Kay v. United States*, 255 F.2d 476, 479 (4th Cir. 1958) ("The [Assimilative Crimes Act], however, does not generally adopt state procedures."); *United States v. Kearney*, 750 F.2d 787, 789 (9th Cir. 1984) ("However, [the Assimilative Crimes Act] does not generally adopt state procedures.").

It is a "fundamental rule of statutory construction" that Kentucky courts "ascertain the intention of the legislature from words used in the statutes rather than surmising what may have been intended but was not expressed." *Wilburn v. Commonwealth*, 312 S.W.3d 321, 327 (Ky. 2010). "When [a] statute is plain and unambiguous, the language of the statute is to be given full effect as written . . . . [Kentucky courts] should not resort to the task of deciphering legislative intent in order to interpret the language of a statute which is abundantly clear. *Jenkins v. Commonwealth*, 496 S.W.3d 435, 470 (Ky. 2016) (Venters, J. dissenting) (quoting *Mohammad v.*

*Commonwealth*, 202 S.W.3d 589, 590 (Ky. 2006)). Similarly, a "basic canon of statutory interpretation [is] that every word in the statute is presumed to have meaning and that courts should give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *In re Village Apothecary, Inc.*, 45 F.4th 940, 948 (6th Cir. 2022) (cleaned up).

## ANALYSIS

Neither party claims the bare text of KRS 530.060 requires a prior judicial finding to prosecute endangering the welfare of a child. *See* Mot. Dismiss Information [DN 11] at 2. Resp. Mot. Dismiss [DN 13] at 1.[4] However, Defendant argues that the Commentary adds that element to the statute.[5] Mot. Dismiss Information [DN 11] at 2. The United States disputes this application of the Commentary. Resp. Mot. Dismiss [DN 13] at 1.

### **Kentucky Caselaw**

Defendant cites two Kentucky cases for support: *Taylor v. Commonwealth*, 617 S.W.3d 321 (Ky. 2020), and *Williams v. Commonwealth*, No. 2019-CA-0164-MR, 2021 WL 753304 (Ky.

---

[4] KRS 530.060 provides:

> (1) A parent, guardian or other person legally charged with the care or custody of a minor is guilty of endangering the welfare of a minor when he fails or refuses to exercise reasonable diligence in the control of such child to prevent him from becoming a neglected, dependent or delinquent child.

Ky. Rev. Stat. § 530.060

[5] The Commentary reads:

> KRS 530.060 imposes a duty on a parent, guardian or other person legally charged with the care or custody of a minor to exercise reasonable diligence in the control of the minor to prevent him from becoming neglected, dependent or delinquent. The duty is imposed only on a parent, guardian or other person legally charged with the care or custody of the minor, not on all persons generally. *In order to sustain a conviction under KRS 530.060 there must be a prior judicial finding of neglect, dependency or delinquency of the child.*

Ky. Rev. Stat. Ann. § 530.060 (West 1974) (emphasis added).

Ct. App. Feb. 26, 2021). These cases addressed ambiguities in the Kentucky Penal Code by looking, *inter alia*, to the Commentary. *Taylor*, 617 S.W.3d at 326 (analyzing the concept of criminal causation); *Williams*, 2021 WL at *3 (applying *Taylor*'s definition of causation). The Government provides *Chapman v. Commonwealth*, No. 2019-CA-000352-MR, 2020 WL 2095901 (May 1, 2020), for guidance.

*Taylor v. Commonwealth* is inapposite here for two reasons. First, the Kentucky Supreme Court was addressing a potential ambiguity in the statute—specifically what "cause" meant. *Taylor*, 617 S.W.3d at 325. The court was not contemplating whether an additional element should be added to the crime of wonton endangerment, it was clarifying an element of the existing statute. By contrast, Defendant seeks to introduce another element to the crime of endangering the welfare of a child, not to clarify any term therein. Mot. Dismiss Information [DN 11] at 2. Second, the *Taylor* court relied on precedent as well as the Commentary in reaching their decision. *Taylor*, 617 S.W.3d at 326 (citing *Robertson v. Commonwealth*, 82 S.W.3d 832, 836–37 (Ky. 2002) and *Bush v. Commonwealth*, 78 Ky. 268 (1880)). The Defendant cites no case which holds the Commentary alone is dispositive. *See generally*, Mot. Dismiss Information [DN 11]; Reply Govt.'s Resp. Mot. Dismiss Information [DN 13].

 In *Chapman v. Commonwealth*, an unpublished opinion[6], the Kentucky Court of Appeals denied arguments nearly identical to Defendant's and refused to require a prior judicial finding to

---

[6] Kentucky Rule of Appellate Procedure 41(A) provides:

> (A) Kentucky Opinions. "Not To Be Published" opinions of the Supreme Court and the Court of Appeals are not binding precedent and citation of these opinions is disfavored. A party may cite to and rely on a "Not To Be Published" opinion for consideration if:

> > (1) it was rendered after January 1, 2003,

prosecute a violation of KRS 530.060. *Id.* at *4. The *Chapman* court concluded the specific

Commentary relied upon by Chapman could not be used as an aid in construing KRS 530.060. *Id.*

The *Chapman* court relied on KRS 500.100, which states "[t]he commentary accompanying this

code may be used as an aid in construing the provisions of this code." Ky. Rev. Stat. § 500.100.

But the *Chapman* court noted that, according to the publisher's note included by the Banks-

Baldwin Company to KRS 500.100, the Commentary "w[as] prepared AFTER enactment of the

Penal Code and are NOT 'Commentary accompanying this Code.'" *Chapman*, 2020 WL at *4

(emphasis in original); *see infra*. Therefore, the Commentary to KRS 530.060 was not a valid

interpretive tool. *Chapman*, 2020 WL at *4.

Uncited by either party is the Kentucky Supreme Court's 1977 opinion *Cooper v.*

*Commonwealth*, 550 S.W.2d 478 (Ky. 1977), or its progeny. In *Cooper*, the defendant argued,

*inter alia*, that he should have been allowed to submit an instruction on sexual misconduct (KRS

510.140) during his trial for sodomy in the first degree (KRS 510.070), and that the existence of

both crimes violated the equal protection clause. *Cooper*, 550 S.W.2d at 479. The court looked to

the Commentary for KRS 510.140 to explain why the sexual misconduct statute existed—namely

"to preserve the concept of statutory rape and statutory sodomy." *Id.* The court went on to explain

that KRS 510.140 was not duplicative because the rape and sodomy statutes included elements of

age for both the perpetrator and victim, whereas sexual misconduct did not. *Id.* at 480. Because of

this, the defendant's argument under the equal protection clause was without merit. *Id.* The court

---

(2) it is final under RAP 40(G),

(3) there is no published opinion of the Supreme Court or the Court of Appeals that
would adequately address the point of law argued by the party, and

(4) the party clearly states that the opinion is not binding authority.

also held that KRS 510.140 was not applicable and the trial court "properly refused to instruct the jury on the offense of sexual misconduct." *Id.*

In reaching its conclusion, the *Cooper* court made some findings that are relevant here. The court did not find that KRS 510.140 was ambiguous: "[t]he bare wording" of the section supported the defendant's position. *Id.* at 479. Had the court followed the fundamental rules of statutory construction, that would have ended the inquiry. *See Wilburn*, 312 S.W.3d at 327. Nevertheless, the court read into the statute an additional element: the ages of the perpetrator and victim must fall within certain brackets. *Cooper*, 550 S.W.2d at 479. To do so, the court referred to the Commentary to KRS 510.140. *Id.* Cases affirming *Cooper* state this clearly. *See, e.g.*, *Jenkins*, 496 S.W.3d at 449–50 (collecting cases). By doing so, the *Cooper* court "arrogate[d] the commentary to the dignity of the statute itself." *Id.* at 470 (Venters, J. dissenting). In other words, the natural consequence of *Cooper* is that the Commentary is dispositive and must be considered when interpreting the Kentucky Penal Code.

### **Application**

Because this case arises under the Assimilative Crimes Act, 18 U.S.C. § 3, this opinion must reconcile these state law cases. *United States v. Walker*, 885 F. Supp. 2d 814, 819 n.7 (E.D. Va. 2012) (state court decisions are precedential because 18 U.S.C. § 13 incorporates state law). The only Kentucky court to squarely address whether KRS 560.030 requires a prior judicial finding was the Kentucky Court of Appeals in *Chapman*. However, the *Chapman* court based its decision on the historical and statutory notes following KRS 500.100 in Baldwin's Kentucky Revised Statutes Annotated. *Chapman*, 2020 WL at *4. This note is not present in other official publications of the Kentucky Revised Statutes. *See* Michie's Kentucky Revised Statutes Annotated, Ky. Rev.

Stat. Ann. § 500.100 (LexisNexis 2023). However, neither is the Commentary. *See id.*; 1974 Ky. Acts ch. 406, sec. 10, effective January 1, 1975; 1974 Ky. Rev. Stat. & R. Serv. 65 (West).

The "commentary accompanying this code" referred to in KRS 500.100 is the commentary accompanying the *Kentucky Penal Code Final Draft* dated November 1971. *Commonwealth v. Crooks*, 655 S.W.2d 475, 477 (Ky. 1983) (Hobgood, J. dissenting). The 1968 Kentucky General Assembly directed the Kentucky Crime Commission and Legislative Research Commission to propose a revision of the state's substantive criminal laws. Legis. Rsch. Comm'n, *Kentucky Penal Code Final Draft*, Introduction (1971). The Commissions' final draft proposal was provided in 1971. *Id.* This draft was accompanied by a commentary explaining "the effect of the proposed section and the relationship of the proposed section to existing law." *Id.* Simultaneously, the code was proposed in bill form to the General Assembly. *Id.* While the bill did not include a commentary, it did include what would become KRS 500.100. *Id.* "After the Kentucky Penal Code was enacted in 1974, the Kentucky Department of Justice, Legislative Research Commission, and Banks-Baldwin Law Publishing Company rewrote the original 1971 Penal code commentary to conform to the Penal Code as finally amended and enacted by the 1974 General Assembly." *Crooks*, 655 S.W.2d at 479 (Hobgood, J. dissenting). This rewritten commentary is "unofficial" and does not appear in official editions of the Kentucky Revised Statutes. *Id.* Therefore, to "resolve the issue of interpretation" for penal code statutes, "one looks to both the proposed code and commentary and the enacted code and commentary." *Id.*

In other words, under the rationale of *Cooper*, practitioners and judges must refer to an unofficial, unenacted, draft proposal from the Legislative Research Commission which is not hosted alongside official editions of Kentucky Revised Statutes to properly practice criminal law in Kentucky. They must also ensure that the current statute is the same as was passed in 1974,

otherwise the binding commentary may no longer apply. Practitioners and jurists must do this *even if the language of the statute is otherwise unambiguous* as the Kentucky Supreme Court did in *Cooper.*

The Kentucky Supreme Court has treated the Commentary inconsistently. Cases like *Taylor* treat the Commentary as merely one of many judicial tools for interpreting ambiguous statutes. *See Taylor,* 617 S.W.3d at 326. Admittedly, neither *Chapman*, nor *Taylor*, nor *Cooper* explicitly says anything about "ambiguity." But all three cases recognize that KRS 500.100 provides that "[t]he commentary accompanying this code may be used as an aid in construing the provisions of this code." *Chapman*, 2020 WL 2095901, *4; *Taylor*, 617 S.W.3d 321, 326; *Cooper*, 550 S.W.2d 478, 480. The Commentary to KRS 500.100, in turn, indicates that "[t]he Commentary may be helpful in cases of ambiguity[.]"

However, the *Cooper* court did not find an ambiguity in KRS 510.140. *Cooper*, 550 S.W.2d at 479. The *Cooper* court did not follow typical rules of statutory interpretation when analyzing KRS 510.140, which would have required it follow the clear language of the statute. The *Cooper* court did not apply the Commentary accompanying KRS 500.100, which would have required an ambiguity before applying the Commentary accompanying statutes. Instead, the *Cooper* court elevated the Commentary to the status of enacted statute and found in it an element of sexual misconduct unrelated to the text of KRS 510.140.

It is unclear if the *Cooper* court intended to require application of the Commentary to the entire Kentucky Penal Code, or if it only applies to KRS 610.140. However, even with numerous opportunities to review or revise *Cooper*'s implications, the Kentucky Supreme Court has not done so. *Jenkins*, 496 S.W.3d at 449–50 (collecting cases). Absent clear instruction from the Kentucky

Supreme Court, this Court must assume the rationale of *Cooper* extends to its logical conclusion—it must be applied throughout the Kentucky Penal Code.

If *Cooper* were less clear this Court might be able to follow the guidance of Kentucky's Attorney General and apply typical rules of statutory interpretation to KRS 530.060. Ky. OAG 77-520 (Ky. A.G.), 1977 WL 28318 at *1 (relying on the "plain language" of KRS 530.060); Ky. OAG 83-83, 1983 WL 166341 at *1 (following the "literal wording of" KRS 530.060). However, the Kentucky Supreme Court has repeatedly affirmed *Cooper*, and has explained that *Cooper* relies on incorporating the Commentary to an otherwise clear statute. *Jenkins*, 496 S.W.3d at 449–50 (collecting cases).

Likewise, if *Cooper* and its progeny had not engaged with KRS 500.100, this Court might be able to apply its Commentary to require an ambiguity. But Justice Venters conjured KRS 500.100 in his dissent to *Jenkins*, and the *Jenkins* court nevertheless affirmed *Cooper*'s reliance on the Commentary. *Jenkins*, 496 S.W.3d at 470, *aff'd Hunter v. Commonwealth*, 2022-SC-0186-MR, 2023 WL 3113344 at *6 (Ky. April 27, 2023).

Therefore, this Court must assume that the Kentucky Supreme Court would apply the Commentary even where a statute is unambiguous, and that KRS 530.060 requires a prior judicial finding of neglect, dependency, or delinquency of the child before a prosecution may be maintained.

## Impact on Federal Enclaves in Kentucky

The present prosecution arose out of Fort Campbell Military Reservation and is proceeding in federal court under the Assimilative Crimes Act, 18 U.S.C. § 13. The Commentary requires a "prior judicial finding of neglect, dependency or delinquency of the child." Ky. Rev. Stat. Ann. §

530.060 (West 1974). The Commentary does not specify in what court or in what type of proceeding the "prior judicial finding" must be made. Were this prosecution to arise under state jurisdiction, the Kentucky Unified Juvenile Code may govern.[7] Ky. Rev. Stat. §§ 600–645. The Juvenile Delinquency Act (JDA), 18 U.S.C. §§ 5031-42, provides the federal court procedure for finding juvenile delinquency. See *United States v. Juv. Male*, 939 F.2d 321, 322 (6th Cir. 1991) (discussing a JDA case from Fort Knox). But neither the JDA nor any other federal law this Court can identify provides for a finding of "neglect [or] dependency . . . of the child" as contemplated by the Commentary.

No state court has the jurisdiction necessary to make the type of "prior judicial finding" contemplated by the Commentary in Fort Campbell. Fort Campbell residents are under the "exclusive jurisdiction" of the United States. In *United States v. Silvers*, No. 5:18-CR-50, 2023 WL 2714003 (W.D. Ky. Mar. 30, 2023), this Court determined the United States has long since accepted "exclusive jurisdiction" over the land that is now Fort Campbell. *Id.* (quoting 1945 letter from United States Secretary of War Henry Stimson to Kentucky Governor Simeon Willis). *Silvers* held that this 1945 letter satisfied the requirements of 18 U.S.C. § 7(3) for placing Fort Campbell lands within the "special maritime and territorial jurisdiction of the United States." *Id.* (quoting 18 U.S.C. § 7). See also *United States v. Griffith*, 864 F.2d 421, 422 (6th Cir. 1988) ("While trespassing on the Fort Campbell Military Reservation, an area of exclusive federal jurisdiction, Griffith shot a fellow hunter."); *In re Air Crash Disaster at Gander, Newfoundland on Dec. 12,*

---

[7] The Commentary incorporates Kentucky law prior to the 1974 Penal Code's enactment, but the Kentucky Unified Juvenile Code was enacted in 1986. *See* Ky. Rev. Stat. § 600.010. The Commentary likely refers to KRS 199.990 and similar laws, *see, e.g.*, *Smith v. Commonwealth*, 358 S.W.2d 521 (Ky. 1962) (discussing application of Juvenile delinquency laws), but intervening legislation repealed these statutes. Because of this, it is even more unclear whether or how a Kentucky court, not to mention this Court, should apply the Commentary to KRS 530.060.

*1985*, 660 F. Supp. 1202, 1207 (W.D. Ky. 1987) ("Kentucky ceded exclusive jurisdiction over the area comprising Fort Campbell to the United States."); *United States v. Brinson*, 787 F.2d 593 (6th Cir. 1986) (appealing a conviction for "willfully killing an infant in a heat of passion upon land under the exclusive jurisdiction of the United States, the Fort Campbell, Kentucky, military reservation.").

It follows that the "prior judicial finding" required by the Commentary would not arise in the ordinary course in the case of a resident of Fort Campbell. This Court might make that finding during an evidentiary hearing or as part of a final judgement from a prosecution under KRS 530.060. However, neither the Constitution nor any law of the United States this Court has found grants it jurisdiction over juvenile neglect or dependency. *See* 28 U.S.C. § 1331 (granting limited jurisdiction to Federal District Courts). No federal entity makes such a finding, and no state entity has the authority to impose such a finding. Thus, because application of the Commentary requires a prior judicial finding to engage in a prosecution, it is unclear how KRS 530.060 can be enforced in exclusive federal enclaves like Fort Campbell and Fort Knox, at least with regard to "neglect [or] dependency".

## CONCLUSION and ORDER

Therefore, Defendant's Motion to Dismiss the Information [DN 11] is **GRANTED.** Pursuant to 28 U.S.C. § 636, the parties may appeal this final judgment of dismissal to the District Judge assigned to this case within fourteen days. 18 U.S.C. § 3402 (establishing right to appeal to the District Judge in misdemeanor cases); 18 U.S.C. § 3731 (permitting appeal of a dismissal of an information).

October 23, 2023

**Lanny King, Magistrate Judge**
**United States District Court**

12